# EXHIBIT C

-----------------------------------------------------------x

In the Matter of the Appeal

                        Between

NATIONAL HOCKEY LEAGUE PLAYERS'

ASSOCIATION

                   -and-

NATIONAL HOCKEY LEAGUE


RE:  DENNIS WIDEMAN

-----------------------------------------------------------x


                           ORDER

## ORDER

Dennis Wideman has appealed from a February 3, 2016 supplementary discipline decision suspending him for twenty (20) games. This shall constitute my determination of Mr. Wideman's appeal. For the reasons described herein, I find that the decision suspending Mr. Wideman for twenty (20) games was supported by clear and convincing evidence.

## SUMMARY OF FACTS

At 11:19 of the second period of the January 27, 2016 game between the Calgary Flames and the Nashville Predators, Mr. Wideman (a defenseman with Calgary) made a pass from his defensive corner and received a hard, legal check into the boards by Nashville's Miikka Salomaki. Wideman fell to one knee, got up slowly, touched his hand briefly to his helmet and began skating up ice in the direction of his bench to make a line change. As play continued, Mr. Wideman skated almost half the length of the ice parallel to the boards. As he approached the bench area, Mr. Wideman converged with linesman Don Henderson, who was skating backwards in Wideman's direction. As he approached the linesman, Wideman raised his stick off the ice, clenched it in both hands and delivered a forceful blow to the upper back of Mr. Henderson, causing Mr. Henderson to fall face forward on to the ice, where Mr. Henderson lay prone for several seconds. Without stopping or hesitating in any fashion, Mr. Wideman continued to proceed to the Calgary bench.

As set forth in reports filed by each of the four on-ice officials (Exh. E), none of the officials saw what had happened. No on-ice penalty was called on Mr. Wideman. Messrs. Henderson and Wideman both continued in the game and both were subsequently diagnosed as having suffered concussions.

## PROCEDURAL HISTORY

Mr. Wideman was suspended indefinitely on January 28 pending an in-person supplementary discipline hearing before Colin Campbell, National Hockey League ("NHL") Senior Executive Vice President of Hockey Operations. The hearing was conducted in Toronto on February 2. The Union raised no objections – procedural or otherwise – with the conduct of the disciplinary hearing itself, during which all parties, including Mr. Wideman, were provided a full and fair opportunity to be heard.

On February 3, the League announced by issuance of a press release and an explanatory video that Mr. Wideman was suspended for twenty (20) games for conduct violative of Rule 40 of the NHL Playing Rules. That evening, the National Hockey League Players' Association ("NHLPA") filed a notice of appeal pursuant to Article 18.12 of the Collective Bargaining Agreement ("CBA") between the NHL and the NHLPA.

## STANDARD OF REVIEW

Section 18.12 of the CBA provides for the right to appeal to the Commissioner any decision regarding Supplementary Discipline for On-Ice Conduct. The CBA directs, in connection with any such appeal, that I determine whether the "decision was supported by clear and convincing evidence."

## THE FEBRUARY 10, 2016 HEARING

As set forth in CBA Section 18.12, where, as here, the underlying disciplinary decision results in a suspension of six (6) or more games, and such decision is appealed, I am required to hold an in-person hearing. I held such a hearing on February 10, 2016 at the offices of the League in New York. In attendance at the hearing on behalf of Mr. Wideman were Mr. Wideman himself, NHLPA representatives Don Fehr, Steve Fehr, Don Zavelo, Roman Stoykewych, David Sinclair, Mathieu Schneider and Steve Webb, as well as Bruce Meyer from Weil Gotshal & Manges. The Calgary Flames

2

were represented by General Manager Brad Treliving.  Also at the hearing were members of the League

office staff, including Bill Daly, David Zimmerman, Julie Grand, Colin Campbell, Kris King and Stephen

Walkom, as well as Joseph Baumgarten and Ebony Ray from Proskauer Rose.  The hearing was also

attended by Mr. Henderson, as well as Andrew Brodkin and Dan O'Halloran representing the National

Hockey League Officials' Association ("NHLOA").

The hearing began at approximately 10:15 a.m. and concluded at approximately 4:15 p.m.  All

parties were given a full and fair opportunity to be heard.  At the hearing, the NHLPA objected to the

presence of Mr. Henderson and the NHLOA representatives, specifically with respect to the elicitation of

medical testimony concerning Mr. Wideman.  I gave the NHLPA the opportunity to request that they be

excluded during specific portions of that testimony.  The NHLPA did not avail itself of this opportunity.

The NHLPA also objected to my order sequestering one of its expert witnesses (Dr. Jeffrey Kutcher), who

arrived in the middle of the testimony of another expert witness (Dr. Paul Comper).  Lastly, the NHLPA

objected to presenting its case first.  The transcript of the hearing was received at the League office on

February 16, 2016.

## THE PLAYING RULES AT ISSUE

Playing Rule 28 provides that the Commissioner "may, at his discretion, investigate any incident

that occurs in connection with any Pre-season, Exhibition, League or Playoff game and may assess

additional fines and/or suspensions for any offense committed during the course of a game or any

aftermath thereof by a player . . . whether or not such offense has been penalized by the Referee."

Here, the conduct at issue involves physical contact between a player and an official.  Playing

Rule 40 ("Physical Abuse of Officials") provides that physical abuse of an official is punishable by a game

misconduct and an automatic suspension depending on the severity of the infraction.  The rule then sets

forth three (3) categories of infractions:

> 40.2  **Automatic Suspension – Category I** – Any player who deliberately strikes an
> official and causes injury or who deliberately applies physical force in any manner
> against an official with intent to injure, or who in any manner attempts to injure an
> official shall be automatically suspended for not less than twenty (20) games. (For
> the purpose of the rule, "intent to injure" shall mean any physical force which a
> player knew or should have known could reasonably be expected to cause injury.)
>
> 40.3  **Automatic Suspension – Category II** – Any player who deliberately applies
> physical force to an official in any manner (excluding actions as set out in Category I),
> which physical force is applied without intent to injure, or who spits on an official,
> shall be automatically suspended for not less than ten (10) games.
>
> 40.4  **Automatic Suspension – Category III** – Any player who, by his actions,
> physically demeans an official or physically threatens an official by (but not limited
> to) throwing a stick or any other piece of equipment or object at or in the general
> direction of an official, shooting the puck at or in the general direction of an official,
> spitting at or in the general direction of an official, or who deliberately applies
> physical force to an official solely for the purpose of getting free of such an official
> during or immediately following an altercation shall be suspended for not less than
> three (3) games.

As set forth in Rule 40.5, after a game in which a game misconduct penalty is imposed, "the Referees

shall, in consultation with the Linesmen, decide the category of the offense."  That determination is then

reviewable by the Commissioner at the request of either the player or the officials.

Here, the on-ice officials did not observe the incident and no game misconduct penalty was

called.  Accordingly, Mr. Wideman was not subject to an automatic suspension under Rule 40.  Rather,

the matter was noticed for a supplementary discipline hearing before Mr. Campbell (and subsequently

appealed to me) in accordance with Article 18 of the CBA.   Nevertheless, in reviewing this matter

pursuant to the criteria set forth in Article 18, I find that the standards set forth in Rule 40 provide an

appropriate framework for consideration of whether to impose discipline and, if so, in what amount.  I

note that Article 18.2 provides that the following factors will be taken into account in determining

supplementary discipline:

4

(a) The type of conduct involved:  conduct in violation of League Playing Rules, and whether the conduct is intentional or reckless, and involves the use of excessive and unnecessary force.  <u>Players are responsible for the consequences of their actions.</u>  (Emphasis added.)

(b) <u>Injury to the opposing Player(s) involved in the incident.</u>  (Emphasis added.)

(c) The status of the offender and, specifically, whether the player has a history of being subject to Supplementary Discipline for On-Ice Conduct.  <u>Players who repeatedly violate League Playing Rules will be more severely punished for each new violation.</u>  (Emphasis in original.)

(d) The situation of the game in which the incident occurred, for example:  late in the game, lopsided score, prior events in the game.

(e) <u>Such other factors as may be appropriate in the circumstances</u>.  (Emphasis added.)

Article 18.2(e) recognizes that a variety of "other factors" may be appropriate to consider in individual cases.  Here, one such factor is the existence of a rule (Rule 40) that expressly addresses the type of conduct in question and that prescribes <u>automatic minimum</u> suspensions depending on the severity of the conduct.  Although Rule 40 was not technically invoked here (because no game misconduct penalty was called by the on-ice officials), I find that the standards set forth in Rule 40 provide a useful (albeit non-binding) framework (together with the applicable Article 18.2 factors quoted above) for determining discipline.  To be clear, however, my decision to impose discipline takes into account all of the applicable Article 18.2 factors and does not constitute an "automatic" suspension.

## THE NHLPA'S CONTENTIONS

The NHLPA contends that the Player was not responsible for cross-checking the Linesman because the Player had suffered a concussion seconds earlier as a result of being checked and hitting his head against the boards and/or glass.  To paraphrase the Union's contention, the Player suffered immediate and serious diminishment in his mental and/or physical capacity such that he was unable to avoid contact with the Linesman.  He therefore did not commit a "deliberate" act of misconduct and did not have the requisite "intent to injure" to justify supplementary discipline.  Although the NHLPA

5

acknowledged that I have the authority to reduce the suspension imposed by Mr. Campbell, the Union did not actually request a reduced suspension, maintaining at all times that no suspension is warranted.

## ANALYSIS

"Among the most important rules in the NHL's Rulebook are the rules which protect the integrity and physical well-being of our officials." (In re Appeal of J.J. Daigneault Suspension, dated March 5, 1997)  Thankfully, instances of conduct inconsistent with these rules are few and far between. Where they have occurred, I have not hesitated to impose appropriate discipline – even where, as here, the player involved had no prior incidents of a similar nature.[1]

Mr. Wideman's conduct, as reflected on the video footage of the incident, fits easily within the framework of Category I offenses.  As quoted above, Rule 40.2 calls for a minimum twenty (20) game suspension if:

(i)     The player deliberately struck an official and caused injury; or

(ii)    The player deliberately applied physical force in a manner that the player knew or should have known could reasonably be expected to cause injury[2]; or

(iii)   The player in any manner attempted to injure an official.

---

[1]     In the Daigneault case, for example, I noted that the player had, over thirteen seasons in the League, "always proven himself to be a solid and respected player whose conduct has been rarely reviewed," and that the incident leading to discipline had been "nothing more than a temporary lapse of judgment on his part."  Likewise, I applied Rule 40 to discipline Rob Ray notwithstanding the fact that the incident in question was "out of character for Mr. Ray, who for 12 seasons in the National Hockey League ha[d] never been involved in an incident of" the type that led to his suspension.  (In re Appeal of Rob Ray Suspension, dated January 11, 2001)  Here, as well, I am mindful that Mr. Wideman's conduct was out of character for him and I have taken this into account (as did Mr. Campbell) in not imposing a suspension of a longer duration.

[2]     The parenthetical language at the end of Rule 40.2 makes clear that it is not necessary that a player have a specific intent to cause injury.  It is sufficient to find that the player deliberately applied physical force in a way that the player knew or should have known would reasonably be expected to cause injury.

Here, Mr. Wideman struck Mr. Henderson with the shaft of his stick and caused him injury.  In addition, Mr. Wideman deliberately applied physical force in a way that a player would know (or should know) could reasonably be expected to cause injury.  In fact, Mr. Wideman himself acknowledged in his testimony that his blow to Mr. Henderson's back was the kind of blow that can reasonably be expected to cause injury.[3]  (Tr. 79)  Thus, at a minimum, Mr. Wideman's conduct satisfies both of the first two prongs of Rule 40.2.  Separate and apart from Rule 40.2, it is also conduct that involved the use of excessive and unnecessary force within the meaning of Article 18.2(a) of the CBA.

The NHLPA presented evidence at the hearing of other collisions between players and officials, noting that accidents sometimes occur on the ice, and that the collisions between players and officials in those other incidents did not result in supplementary discipline.  That is unquestionably true.  NHL hockey is a fast and physical game.  Each of the incidents referred to by the NHLPA involved collisions that occurred in the midst of play – presumably in the full view of the on-ice officials, who did not call a penalty.  Here, by contrast, no penalty was called because the incident occurred away from the play and none of the on-ice officials witnessed it.  The incident here did not involve anything that remotely resembled a "hockey play."  Mr. Wideman skated nearly half the length of the ice, away from the play.  While approaching the official from behind, Mr. Wideman lifted his stick off the ice while still several feet away, clenched it in both hands and struck the official – extending his arms forcefully -- when they met.  When asked why he had lifted the stick with both hands before even reaching the linesman, Mr. Wideman could offer no explanation.  (Tr. 77)

The NHLPA and Mr. Wideman, however, argue that no discipline is appropriate because Mr. Wideman's conduct was not deliberate and was not the result of any intent to injure.  They contend that

---

[3]     The report prepared by Dr. Jeffrey Kutcher referred to the blow as a "cross-check."  (Exh. 21)  Playing Rule 59 defines "cross-checking" as "[t]he action of using the shaft of the stick between the two hands to forcefully check an opponent."  I agree that the blow to Mr. Henderson was a cross-check.

Mr. Wideman's concussion just prior to the incident rendered him confused and/or physically incapable

of avoiding contact with Mr. Henderson. This explanation rests on the testimony of Mr. Wideman

himself, as well as the testimony and written reports of the neuropsychologist (Dr. Paul Comper) and

neurologist (Dr. Jeffrey Kutcher) whom the Union called to testify. I reject this contention for the

reasons set forth below.

As an initial matter, I accept the Union's proffer of Dr. Comper as an expert in clinical

neuropsychology and "the effect on patients of concussions from a neuropsychological perspective."

(Tr. 108, Exh. 18)  I also accept the Union's proffer of Dr. Kutcher as an expert in the cause, symptoms

and effects of concussions. (Tr. 188, Exh. 20)  However, while I acknowledge their expertise as clinicians,

I am mindful that neither of them diagnosed or treated Mr. Wideman. Rather, they were retained as

consultants and asked by the NHLPA to interview Mr. Wideman several days after the incident (and

after his symptoms had resolved) for purposes of the supplementary discipline proceeding. (Tr. 110) I

have carefully considered the testimony and evidence presented by each, which I summarize briefly

below.

<u>Dr. Comper</u>

On direct examination, Dr. Comper defined a concussion as a "pathophysiological change that

occurs to the brain induced by biomechanical force most frequently to the head, but not exclusively."

(Tr. 104)  He identified several "outward objective" signs of disrupted brain functioning as including

"anything from balance impairment to. . . disorientation, not knowing where they are to garbled speech

and confusion. . . . "  (Tr. 105)  He went on to identify a variety of other possible symptoms, including

(without limitation) headache, dizziness, loss of balance, nausea, memory dysfunction, loss of

awareness, inability to concentrate, anxiety, depression, and irritability. In response to a question from

NHLPA counsel as to whether "motor skills" are affected in the acute phase of concussion, Dr. Comper

8

carefully qualified his words, stating that "[t]hey <u>can</u> be and this is where you <u>might</u> see somebody exhibit a loss of balance, falling over." (Tr. 107, emphasis added.)

Dr. Comper was retained by the NHLPA on Sunday, January 31 and was asked to address "whether the Player's ability to formulate an intention to make contact with the [linesman] was adversely affected at . . . the time of the events and, if so, the extent to which his ability to formulate an intention was affected." (Exh. C) Dr. Comper interviewed Mr. Wideman that same day – four days after the Calgary-Nashville game. The interview was done remotely by "FaceTime" (for approximately thirty-five (35) minutes), which Dr. Comper acknowledged is not his normal practice. (Tr. 142) (Mr. Wideman himself testified that he was in Scottsdale, Arizona vacationing during the All-Star break, during which he engaged in physical activities without restriction (golf and hiking). (Tr. 90-91))

Dr. Comper provided the NHLPA with a report on February 2, stating, among other things, that Mr. Wideman's "striking of the official could both plausibly and probably be attributed to his confusional state while he was in the immediate post-concussion phase. Indeed, behavioural changes – including aggressive and even combative behaviours – are commonly reported behavioural hallmarks of head trauma." (Exh. 19) In addition, "it is my view that Mr. Wideman's usual capacity to exercise his judgment and to control his impulses was significantly affected by the head trauma that he experienced during the January 27, 2016 game for the period immediately after that incident." As I discuss below, however, Dr. Comper testified at the hearing that he could <u>not</u> say whether Mr. Wideman's judgment had been impaired at the time of the incident.

<u>Dr. Kutcher</u>

Dr. Kutcher was also retained by the NHLPA on January 31 and asked to interview Mr. Wideman, which he (like Dr. Comper) did via "FaceTime" on February 1. On direct examination, Dr. Kutcher

testified that a concussion "occurs when the brain undergoes mechanical force inducing a state of physiological distress . . . when the brain experiences force, there is mismatch of available energy, and the brain does not have the ability to form networks like it typically would, and produces a whole host of symptoms across the spectrum of brain function." (Tr. 189)  He testified that it is "very, very common" for a concussion to produce "a change in awareness, a change in basically any cognitive ability that the brain possesses so a lack of orientation, impulse control, memory issues, personality changes, inability to coordinate complex tasks." (Tr. 191)   Motor incoordination is a potential effect, though "people can certainly be concussed and have completely fine motor coordination." (Tr. 192)  Asked whether loss of impulse control always occurs during the acute concussed phase, he responded:  "Certainly not.  All presentations are different, but it is something that I see quite commonly." (Tr. 194)

Dr. Kutcher characterized Mr. Wideman's cross-check of Mr. Henderson as "a very dramatic and rare play" in his report and he testified that "concussed individuals oftentimes have bizarre behaviors . . . . This is not an unusual presentation of concussion and comes strictly from disorientation, lack of awareness and impulse control difficulties induced by the injury." (Tr. 198)  On direct examination, Dr. Kutcher testified that the check by Mr. Salomaki was "certainly enough to cause concussion" and that Mr. Wideman's skating immediately after that check indicated "that he had lack of brain network activation sufficient enough to coordinate his movement." (Tr. 200, 201)  However, when asked whether a lack of motor coordination prevented him from avoiding the linesman, Dr. Kutcher testified that "[i]t's difficult to make that . . . determination based on the video alone that the motor coordination problem at that time was present."  (Tr. 202)  Dr. Kutcher testified that in his interview, Mr. Wideman's memory of the events was "spotty at best, . . . as well as not knowing situationally what had occurred." (Tr. 204)  Asked on direct examination whether Mr. Wideman's "capacity to carry out intentional action [was] affected at the time of the January 27th incident," Dr. Kutcher testified that "somebody whose brain is not forming cohesive plans is unable to suppress inappropriate behaviors"

10

and that "I would say it would be impossible for him to intend to do that in the concussed state that he was in." (Tr. 205-206)

\*     \*     \*

As noted, I accept that Drs. Comper and Kutcher are experts in neuropsychology and neurology, respectively.   However, although they are experienced clinicians, neither treated Mr. Wideman or was responsible for diagnosing his medical condition.  Moreover, their testimony was not simply about the diagnosis or symptomology of concussions.  Rather, both were retained by the NHLPA (for whom each has performed services for many years) for the purpose of opining as to what his mental and/or physical state was at the time of the incident in question.  In order to do so, they relied on remote, brief interviews with Mr. Wideman conducted several days after the incident (at a time when he was well aware that he was the subject of an imminent supplementary discipline hearing) and their own review of the video footage.

As discussed in greater detail below, the conclusions expressed by Dr. Comper and Dr. Kutcher were not based on what Mr. Wideman's capacity <u>actually was</u> at the time in question but about what his condition <u>might have been.</u>  Those conclusions were based on little more than Mr. Wideman's own subjective report of concussion symptoms that he may or may not have actually experienced. The testimony was internally inconsistent in several respects, hedged or vague in other respects and largely belied by what is plainly visible on the video.   For these reasons, and based on my review of the video of the incident, Drs. Comper and Kutcher do not come close to persuading me that the decision to suspend Mr. Wideman was not supported by clear and convincing evidence. I note the following in particular:

11

1.  Dr. Comper's testimony during the hearing contradicted the most fundamental opinion expressed in
    his own report.  During the hearing, Dr. Comper acknowledged that he was retained to try to
    determine whether the player's judgment had been impaired.  (Tr. 143)  As noted above, Dr.
    Comper's February 2 report states that "Mr. Wideman's usual capacity to exercise his judgment . . .
    was significantly affected by the head trauma that he experienced" during the game.  (Exh. 19)  Yet,
    during his direct examination (and again on cross-examination) at the hearing, Dr. Comper testified
    that he could <u>not</u> opine specifically on the question of impairment to Mr. Wideman's judgment:

    Q.    To what extent could a blow to the head affect a patient's judgment?

    A.    In the context of the acute phase, it would be quite common to have impaired
          judgment.

    Q.    And after having reviewed the circumstances here, did you consider that to be
          the case with Mr. Wideman?

    A.    I don't know whether I, honestly, I don't know whether I can speak to his
          judgment as much as I can speak to the issue that he described feeling
          confused.

    MR. BETTMAN: So your judgment is based on what he told you?

    THE WITNESS:  Yes.  (Tr. 127)

                                        *    *    *

    Q.    Your work in this case was to try to determine whether the player was of a
          mental state that would make his judgment impaired?

    A.    Yes . . .

12

Q.      And I believe you've already responded, in response to Commissioner
        Bettman's question sitting here today, you can't make a determination as to
        whether or to what extent the player's judgment was impaired –

A.      That's correct.  (Tr. 143-144)

And, although Dr. Comper's report expressed the view that Mr. Wideman's capacity to control his

impulses was "significantly affected" by a concussion (Exh. 19), he testified at the hearing that he

could <u>not</u> draw that conclusion:

Q.      Are you saying that you believe the player lashed out and had an impulse to
strike the official because of a concussion?

A.      I'm not saying that.  I'm saying that it's a common symptom.

Q.      And you can't draw that conclusion here, correct?

A.      That's correct.  (Tr. 162)

Likewise, Dr. Kutcher hedged during cross-examination as to his conclusion on the same

question:

    . . .

A.  I mean human behaviors, physical behaviors, emotional behaviors, verbal ones
    that we suppress all the time, in a concussed state can come to the surface.

13

Q.  Do you believe that's what happened?


A.  Yes.


Q.  That there was a loss of impulse control?


A.  Yes.


Q.  And what was the impulse that Mr. Wideman lost control of?


A.  Simply to get somebody out of the way to get to the bench.


Q.  So you believe that he, in fact, did hit the referee in order to get him out of the way to get to the bench?


A.  I wouldn't say I can conclude that.  I would say that that's a very natural thing for a hockey player to do when somebody is in their way, to brace themselves in that manner and try to get them out of the way.  I can't speak to the specific reason for doing that activity other than somebody in his way that he needed to . . . (Tr. 218-219, emphasis added).


2.  Dr. Comper's report and testimony concerning Mr. Wideman's "confusion" was based on what

Mr. Wideman himself said in a 35-minute FaceTime interview days after the game – statements

that Dr. Comper took at face value based on his view that "you have to believe what your

patient is telling you." (Tr. 122)  On cross-examination, however, Dr. Comper acknowledged

that Mr. Wideman was not his patient and that he did nothing to test the reliability of what Mr.

Wideman told him:

14

Q.     So when you said on your direct examination in response to Mr. Stoykewych's question about whether you believe the things that Mr. Wideman told you, you said you have to believe what your patient is telling you?

A.     Correct.

Q.     But Mr. Wideman wasn't your patient?

A.     That's correct.

Q.     So you didn't have to believe what he told you, correct?

A.     Yeah.

Q.     But you did?

A.     Yes.

Q.     And . . . you didn't do anything to kind of test out whether what he was telling you might not be the case, did you?

A.     That's correct.

Q.     You simply accepted it at face value?

A.     Yes.

                              *     *     *

15

Q.      And you would agree with me that Mr. Wideman certainly had, at least potentially, the motive to exaggerate his symptoms in order to obtain a report that said he wasn't responsible for his actions, that's at least a possibility, isn't it?

A.      It's a possibility.

Q.      . . . and you didn't discuss that in your report, did you?

A.      No.  (Tr. 137-138, 141)[4]

3.  Neither the NHLPA nor its expert witnesses presented (or even sought) any corroboration for the contention that Mr. Wideman's seemingly intentional actions were in fact the product of a "confused" state.   As noted above, Drs. Comper and Kutcher both simply took what Mr. Wideman told them at face value.   They could have, but did not, seek to corroborate his statements by speaking with the Club's medical trainer, who was not consulted by either Dr. Comper or Dr. Kutcher or asked by the NHLPA to testify at the hearing about Mr. Wideman's supposed "confusional state." [5]

4.  In any event, the references by both doctors to Mr. Wideman's "confusion" are not supported by the narrative that Mr. Wideman provided or by the objective evidence provided by the video footage.   Although Mr. Wideman did tell Dr. Comper that he was "not registering," he also said

---

[4]      Dr. Kutcher similarly testified that he was asked by the NHLPA to "address Mr. Wideman as I [would] any patient." (Tr. 197)  He also accepted Mr. Wideman's statements at face value. (Tr. 212)

[5]      The trainer's notes provided to Drs. Comper and Kutcher do not contain anything to indicate that Mr. Wideman was confused when he returned to the bench or at any point thereafter.  While the trainer's notes state that Mr. Wideman was "hit in second period, states felt unbalanced going to bench [and] cleared in a few minutes" (Exh. 9), Dr. Kutcher testified that Mr. Wideman was not suffering from motor incoordination at the time he struck Mr. Henderson. (Tr. 220)  Mr. Wideman continued to the bench without stumbling or exhibiting any other sign of imbalance immediately before or after the collision.  The only person who fell on impact was Mr. Henderson.

16

that he knew he had to get to the bench and that he was "focused" on getting there.  Mr.

Wideman testified at the hearing that "I knew I wasn't right.  I knew I was injured, and I knew I

had to get off the ice."  (Tr. 65)  He knew all of that "within an instant" of the Salomaki hit.  (Tr.

65)  I do not accept the proposition that Mr. Wideman "knew" all of that without also knowing

that he could not cross-check the linesman, particularly in light of the fact that Mr. Wideman

skated directly to the bench with his head up and gave no indication that he was confused (e.g.,

he did not hesitate, he did not skate in the wrong direction, or to the wrong bench or to the

penalty box).  Along the way, he lifted his stick and tapped it on the ice to signal a line change to

his bench.[6]  (Mr. Wideman acknowledged that video of the incident shows Calgary defenseman

T.J. Brodie climbing over the boards in response.  (Tr. 76))  Mr. Wideman recognized Mr.

Henderson as an on-ice official. (Tr. 60)   He also told Dr. Comper (and testified at the hearing)

that he realized that he was going to hit Mr. Henderson just before he did so and that he

attempted to get out of the way, thus undermining Dr. Kutcher's suggestion that he experienced

"situational unawareness."  (Tr. 220).[7]  Moreover, after striking Mr. Henderson, Mr. Wideman

continued past the end of the Nashville bench and stepped directly onto Calgary's bench,

making clear (again) that he knew exactly where he was.  In these circumstances, the hypothesis

[6]      Dr. Comper did not ask Mr. Wideman about this in his January 31 interview of him and testified at the hearing that "[i]t's not important because you can act automatically and do repetitive behaviors following a head injury that are part of your repertoire."  (Tr. 167)  Of course, one such repetitive behavior that would be part of any player's "repertoire" would be to refrain from striking an official and no explanation was provided for why Mr. Wideman did not so refrain.

[7]      When asked how he squared his conclusion that Mr. Wideman lacked "situational awareness" with Mr. Wideman's statements that he saw, and tried to avoid, the linesman, Dr. Kutcher testified:  "I think we're discussing a concussed individual and I think they are confused."  (Tr. 221)  That reasoning is entirely circular.

that Mr. Wideman lacked "situational awareness" strains common sense beyond the point of credibility.[8]

5.  Dr. Kutcher testified that he based his opinion, in part, on the fact that Mr. Wideman told him that he "vaguely remembers skating to the bench. He remembers some incident occurring, but he does not recall who he hit [or] how he hit the individual." (Tr. 203)  In fact, however, at the hearing, Mr. Wideman testified that he does recall colliding with the linesman and that he became aware it was going to occur prior to contact being made. (Tr. 86)  In fact, the video shows Mr. Wideman lifting his stick to cross-check the linesman before he actually made contact.  It was not a reflex action caused by impact.

6.  The reports prepared by Dr. Comper and Dr. Kutcher both exaggerated the severity of Mr. Wideman's physical symptoms. Dr. Comper's report recounted that Mr. Wideman "skated in a hunched-over manner to his team bench." (Exh. 19) On cross-examination, however, he acknowledged that Mr. Wideman straightened up even before he reached his own blue line – a fact that Dr. Comper said he did not take into account in reaching the opinion expressed in his report. (Tr. 164) Dr. Kutcher's report stated that Mr. Wideman took "a few labored and uncoordinated strides as he moved to return to the bench." (Exh. 21) On cross-examination, Dr. Kutcher limited that observation to "the first two or three strides" and testified that "by the time he's approaching the blue line, he appears to be skating with more purposeful strides" and, significantly, <u>with no sign of motor incoordination.</u>[9]  (Tr. 214-215)

---

[8]      I note that Mr. Wideman gave a post-game interview in which he essentially denied having been "woozy." Mr. Wideman testified at the hearing that he had been instructed to give a misleading answer if asked about his condition and that he followed that instruction. (Tr. 61-62, 84-85)

[9]      During the hearing, the NHLPA introduced evidence that the Calgary concussion spotter log (Exh. 8) shows a notation of "motor incoordination/balance" problems and that the Player should have been removed from the game and evaluated pursuant to the NHL-NHLPA concussion protocol. I make no finding at this time on whether

7.  Drs. Comper and Kutcher reached different conclusions about Mr. Wideman's conduct. As noted above, Dr. Kutcher characterized Mr. Wideman's act as a cross-check. Dr. Comper disagreed with that conclusion. His testimony is illuminating as to the subjectivity of his (and Dr. Kutcher's) own conclusions.

Q.   Would it surprise you to learn that Dr. Kutcher characterized that as a cross-check in his --

A.   Not at all. So we can look at the same video and have ten different responses.

Q.   Is that right?

A.   Yes.

Q.   Ten different responses about what?

A.   So when you characterize videos we often have to get consensus on what we're seeing, and even when we see things in slow motion, you may see something differently than I do, and that's just human nature.

Q.   And we may draw different conclusions from that, correct?

8.  A.   Yes. (Tr. 170)[10]

---

the Club violated the concussion protocol, a question that need not be decided here and that I reserve for another day.
[10]   I do not agree that there can be "ten different responses" to the video of the incident. However, it is noteworthy that the Player's two experts did not agree with each other about what they saw.

9.  Dr. Comper's report stated that "behavioural changes – including aggressive and even combative behaviours – are commonly reported behavioural hallmarks of head trauma." (Exh. 19)  Dr. Kutcher's report stated that Mr. Wideman's behavior was "consistent with what we often see in acutely concussed individuals demonstrating poor impulse control, memory difficulty, and confusion states that are transient in nature . . ." (Exh. 21)  General statements of that kind -- concerning what is "commonly reported" or "often seen" – were made repeatedly.  However, as Dr. Comper acknowledged, concussions "are unique" and one size does not fit all with respect to symptomology. (Tr. 112)  In Dr. Kutcher's words, "[a]ll presentations are different . . ." (Tr. 194)  Thus, generalizations about possible or "common" symptoms have little probative value as compared to observations that can be drawn from watching footage of the incident itself.  This point is illustrated by the following exchange with Dr. Kutcher about the incidence of "confusion" as a byproduct of concussion:

Q.  That's not always the case you're confused?

A.  In concussion, no, not always.

Q.  Not always the case that you're unable to form intentions and control your action?

A.  Not always the case, but very common.

Q.  But it's also common that that's not the case?

A.      Sure. (Tr. 221-222)

In sum, I find that the expert testimony presented on behalf of the Player was speculative, at times contradictory, lacked support and was wholly insufficient to rebut the clear and convincing evidence provided by the video footage of the incident. In addition, I do not credit Mr. Wideman's testimony. In particular, I do not credit his testimony that he tried to avoid the linesman at the last minute. He did not swerve out of the way and he did not merely bump into the linesman or put his hands or arms on him. As noted, he raised his stick and cross-checked him in the upper back. I do note, however, that Mr. Wideman's testimony on this point (which, like the rest of what he had to say, was accepted unquestioningly by the NHLPA's experts) is inconsistent with Dr. Kutcher's suggestion that he lacked "situational awareness." Moreover, he was aware enough to tap his stick on the ice to signal a line change and skate directly to the Calgary bench. His head was up as he did so and he testified that he recognized the person skating towards him as an official. He was not wobbly; indeed, he hit the official with full force and then continued to the Calgary bench. Even if one were to assume some level of distress on Mr. Wideman's part as a result of a concussion or other injury caused by the Salomaki check, there was no sign that he was disoriented in any material way and his every instinct as an NHL player should have been to avoid hitting Mr. Henderson, as opposed to cross-checking him in the back.

In short, the record as a whole does not support the contention that Mr. Wideman's actions were the result of confusion, a failure of "impulse control"[11] or a loss of balance. Moreover, to find on a record such as this one that the Player was not responsible for the consequences of his actions would set a precedent that could be easily manipulated in the future in a way that would make the game more dangerous for all participants, including players.

---

[11]      In fact, Mr. Wideman denied having had any impulse or urge to strike the official. (Tr. 60 )

Having made this determination, I am left with the firm view that a significant suspension is appropriate. On-ice officials simply cannot be made the target of a player's frustration or anger. As noted above, the NHLPA observed that a reduced suspension is within the realm of possibility, though the Union did not suggest one. I do not see a basis for a lesser penalty, particularly given the severity of the conduct involved.

On the other hand, I have the authority to impose a more substantial suspension, and I am troubled by Mr. Wideman's total failure to accept any responsibility for his actions. Indeed, although he made much at the hearing about the apologies he had already made to Mr. Henderson, the sincerity of those apologies rings somewhat hollow given the text message he sent to a teammate on February 2 – after the conclusion of the hearing before Mr. Campbell – that "[t]he only problem and the only reason I'm here is cause the stupid refs and stupid media." (Exh. B) Nevertheless, in light of Mr. Wideman's prior exemplary disciplinary record, I decline to increase the suspension imposed by Mr. Campbell, which corresponds to the minimum penalty that would apply if Rule 40.2 were applicable.

## CONCLUSION

The twenty (20) game suspension of Dennis Wideman is supported by clear and convincing evidence and is therefore affirmed.

/s/ Gary B. Bettman                                    Dated: February 17, 2016
    Gary B. Bettman

22