UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: Mar 15, 2017
```

National Hockey League,

        Plaintiff,

    –v–

National Hockey League Players' Association,

        Defendant.

16 Civ. 4287 (AJN)

<u>MEMORANDUM & ORDER</u>

ALISON J. NATHAN, District Judge:

On June 8, 2016, the National Hockey League ("NHL") filed a Complaint in the Southern District of New York, seeking vacatur of the March 10, 2016 arbitral decision of James Oldham reducing the suspension of NHL player Dennis Wideman from 20 games to 10. *See* Dkt. No. 1 (hereafter the "Complaint"). Before the Court are a set of dispositive motions. First, the National Hockey League Players' Association (hereafter "Players' Association"), the Defendant named in the Complaint, moves to dismiss the Complaint on procedural grounds. *See* Dkt. No. 14 (hereafter "Motion to Confirm"). In the alternative, the Players' Association moves to confirm the arbitration award. *See id.* Second, the NHL moves for summary judgment on the question of whether the Court should vacate the arbitration award. *See* Dkt. No. 19 (hereafter "Motion to Vacate"). For the reasons that follow, the Court denies the Players' Association's motion to dismiss on procedural grounds but grants the Players' Association's motion to confirm the award. Accordingly, the Court denies the NHL's motion for summary judgment.

## I.   Background[1]

### 1.  The Collision

On January 27, 2016, at a NHL game between the Calgary Flames and the Nashville

Predators, Miikka Salomaki (a Predators' player) legally cross-checked Dennis Wideman (a

player for the Flames), causing Wideman's head to hit the boards, and causing Wideman to

suffer a concussion. *See* Dkt. No. 1, Ex. 4, at 6 (hereafter, "Opinion of Arbitrator" or "Arb.

Op."); Dkt. No. 1, Ex. 3, at 1 (hereafter, "Opinion of Commissioner" or "Comm. Op.").

Wideman remained in a crouched position for several seconds, after which he rose and began

skating towards the Flames' bench. *See* Arb. Op. at 6; Comm. Op. at 1.  He raised his stick and

touched it to the ice, to signal to his fellow teammates his desire to switch out with another

player. *See* Arb. Op. at 6.  At the same time that Wideman was skating towards the Flames'

bench, linesman Don Henderson, a hockey official, was skating backwards towards Wideman.

*See* Arb. Op. at 7; Comm. Op. at 1.  Just before the two men – player and official – collided,

Wideman raised his hockey stick in the air so that the stick made contact with Henderson's back.

*See* Arb. Op. at 7; Comm. Op. at 1.  Henderson promptly fell to the ice, hitting his head on the

boards as he fell; Wideman continued to the Flames' bench. *See* Arb. Op. at 7.  Both men were

ultimately diagnosed as suffering from concussions: Wideman's stemming from the legal cross-

---

[1] The following facts are taken from the two arbitral decisions provided by the parties to this Court, as well as portions of the hearing transcripts.  In laying out these facts, the Court does not itself find any facts nor endorse any particular view of the facts, nor would it be the Court's place to do so. *See Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 536 (2d Cir. 2016) ("Because it is the arbitrator's view of the facts and the meaning of the contract that the parties bargained, courts are not permitted to substitute their own.").  Further, though the parties' respective motions come to the Court under different procedural postures (one a motion for summary judgment, another a motion to confirm the arbitration award), neither party suggests that there are any questions of disputed, material fact nor suggests that this Court should, could, or must resolve any such questions to decide the pending motions. *Compare* Dkt. No. 21 (NHL's statement of undisputed facts); *with* Dkt. No. 23 (Players' Association's counter statement).  The purpose of this background section is to provide the necessary context to explain this Court's determination.

check he received from Salomaki; Henderson's from the collision and fall. *See* Arb. Op. at 7; Comm. Op. at 1. This case stems from the subsequent discipline Wideman received from the NHL for injuring Henderson, and the decisions of two arbitrators first affirming, and then modifying, the imposed penalty.

### 2. The Collective Bargaining Agreement

The NHL is authorized to impose "supplementary discipline" on players, like Wideman, for conduct during a game pursuant to a collective bargaining agreement entered into on September 16, 2012, between the NHL and the Players' Association. *See generally* Dkt. No. 1, Ex. 1 (hereafter, "CBA"). Substantively, the CBA lays out several factors that guide the NHL in imposing such discipline: first, "[t]he Type of conduct involved," including whether "the conduct is intentional or reckless"; second, the "[i]njury to the opposing Player(s) involved in the incident"; third "[t]he status of the offender and, specifically, whether the Player has a history of being subject to Supplementary Discipline for On-Ice Conduct"; fourth, "[t]he situation of the game in which the incident occurred"; and fifth, "[s]uch other factors as may be appropriate in the circumstances." *Id.* Art. 18.2.

Procedurally, the CBA describes a series of hearings and appeals governing the imposition of certain penalties. As relevant here, if a preliminary review of the incident giving rise to a potential penalty suggests that the NHL will impose a penalty comprising a suspension of six or more games, "an in-person hearing will be conducted." *Id.* Art. 18.9. Any penalty imposed by the NHL after such a hearing is then appealable, by the Players' Association (on the player's behalf), to the NHL Commissioner. *See id.* Art. 18.12. If the penalty imposed by the NHL resulted in a suspension of six or more games, the "Commissioner shall conduct an in-person hearing." *Id.* At that hearing, the Commissioner then must determine "whether the decision [of

the NHL] was supported by clear and convincing evidence," and, in making this determination,
will "have the authority to consider any evidence relating to the incident even if such evidence
was not available at the time of the initial . . . [disciplinary] decision." *Id.*

The decision of the Commissioner is final in all cases resulting in suspensions of five or
fewer games. *Id.* However, if the Commissioner agrees that clear and convincing evidence
supports imposition of a suspension of six or more games, the Players' Association has one more
avenue of appeal under the CBA: the Players' Association may appeal to a "Neutral Discipline
Arbitrator" (hereafter "Arbitrator"), an arbitrator jointly appointed by the parties who "should
have substantial experience as an arbitrator or judge." *Id.* Art. 18.13-14. The Arbitrator is
directed, under the CBA, to hold an in-person hearing, at which he must determine "whether the
final decision of the League regarding whether the Player's conduct violated the League Playing
Rules and whether the length of the sentence imposed were supported by substantial evidence."
*Id.* Art. 18.13. As it does with the Commissioner, the CBA provides the Arbitrator "the
authority," at that hearing, "to consider any evidence relating to the incident even if such
evidence was not available at the time of the initial [hearing] or at the time of the
Commissioner's decision in connection with the [first] appeal." *Id.* The CBA also states that
"[t]he [Neutral Discipline Arbitrator] shall have full remedial authority in respect of the matter
should he/she determine that the Commissioner's decision was not supported by substantial
evidence," and that "[t]he [Neutral Discipline Arbitrator's] decision shall be final and binding in
all respects and not subject to review." *Id.*

### 3. Wideman's Penalty and the Subsequent Appeals

On February 3, 2016, the NHL, following an in-person supplementary discipline hearing in
Toronto, imposed a 20-game suspension on Wideman for conduct violating Rule 40 of the NHL

4

player's rules. *See* Comm. Op. at 2. Rule 40 governs the "physical abuse of officials." *See* Dkt. No. 1, Ex. 2 (hereafter "NHL Off. Rules"). The Rule states that "[a]ny player who deliberately applies physical force in any manner against an official . . . shall receive a game misconduct penalty." *See* NHL Off. Rules § 40.1. In particular, Rule 40 lays out three kinds of automatic suspensions relating to injury of an official (the third of which is not relevant here). Rule 40.2 governs the most severe conduct under the rule: "Any player who deliberately strikes an official and causes injury or who deliberately applies physical force in any manner against an official with intent to injure, or who in any manner attempts to injure an official shall be automatically suspended for not less than twenty . . . games." *Id.* § 40.2; *see also id.* ("For the purpose of the rule, 'intent to injure' shall mean any physical force which a player knew or should have known could reasonably be expected to cause injury."). In contrast, Rule 40.3 governs serious, but less severe, conduct: "Any player who deliberately applies physical force to an official in any manner (excluding actions as set out in [Rule 40.2]), which physical force is applied without intent to injure . . . shall be automatically suspended for not less than ten . . . games." *Id.* § 40.3. Automatic suspensions under the NHL Official Rules are imposed when a "game misconduct penalty" is called during a game, *see* Comm. Op. at 4, and no such penalty was called during the game in which Wideman collided with Henderson, *see id.* Nevertheless, the NHL relied on Rule 40 as a touchstone for its inquiry into supplementary discipline, concluding that Wideman's conduct met the relevant definition of intentional or reckless conduct under Rule 40.2 and that a 20-game suspension was warranted. *Id.* at 2. Pursuant to the CBA, the Players' Association appealed to the Commissioner.

### 4. The Commissioner's Decision

On February 10, 2016, NHL Commissioner Gary Bettman presided over a hearing, pursuant to Article 18.2 of the CBA, to review the determination of the NHL.[2] *See* Comm. Op. at 2.  At that hearing, the principal evidence consisted of video footage of the collision.  *See* Arb. Op. at 1 (describing the earlier hearing).  Additionally, Wideman testified on his own behalf, and the Players' Association presented video footage of other on-ice collisions between players and officials that did not result in supplementary discipline, seeking to demonstrate that Wideman's actions were similar.  The Players' Association also presented the testimony of two physicians, Dr. Paul Comper and Dr. Jeffrey Kutcher, experts in concussions and related symptoms, who had conducted interviews with Wideman over "face time" several days after the January 27th incident.  *See id.* at 1-2.  The NHL presented the testimony of Don Henderson, the lineman with whom Wideman had collided.  *Id.* at 1.

In a decision issued a week later, the Commissioner found that clear and convincing evidence supported the NHL's imposition of a 20-game penalty.  *See* Comm. Op. at 1.  The Commissioner began by observing that, though NHL Rule 40, governing player physical abuse of officials, was not directly apposite (as no game misconduct penalty was called), it was the appropriate touchstone for the Commissioner's inquiry, in concert with those other factors listed under Article 18.2 of the CBA.  *See id.* at 4-5.  The Commissioner then concluded that "Mr. Wideman [in striking Henderson with the shaft of his hockey stick] deliberately applied physical force in a way that a player would know (or should know) could reasonably be expected to cause injury," rendering Rule 40.2 the appropriate rule, and the 20-game suspension the appropriate penalty. *Id.* at 7.

---

[2] Transcripts from this hearing appear in the record at Dkt. No. 20, Ex. 5 (hereafter, "Comm. Tr.").

In reaching this determination, the Commissioner relied primarily on video footage of the incident. *See id.* at 21 ("In sum, I find that the expert testimony presented on behalf of the Player was speculative, at times contradictory, lacked support, and was wholly insufficient to rebut the clear and convincing evidence provided by the video footage of the incident."). He did, however, make various findings as to the other evidence in the record before him. First, he addressed Wideman's testimony. The Commissioner noted that Wideman himself had acknowledged that "his blow to Mr. Henderson's back was the kind of blow that can reasonably be expected to cause injury." *Id.* at 7.[3] He then observed that Wideman had offered no explanation "why he had lifted the stick with both hands before even reaching the linesman." *Id.* Additionally, the Commissioner observed that, though the Players' Association had presented evidence of other collisions that did not result in any disciplinary action, these incidents were not analogous, as they occurred in the midst of "[hockey] play[s]" and had been observed by referees when they occurred. *See id.*

The Commissioner next rejected the Players' Association's argument that Wideman's concussion rendered him "confused and/or physically incapable of avoiding contact with Mr. Henderson," and that the collision was therefore "not deliberate." *Id.* at 7-8. First, in assessing testimony of Drs. Comper and Kutcher, who offered purportedly expert opinions that Wideman was suffering from various concussion-related symptoms after being checked by Salomaki that could affect his intent, the Commissioner noted that these doctors "interview[ed Wideman]

---

[3] The Commissioner referred, here, to Wideman's testimony addressing his knowledge and intent in striking Henderson. Wideman testified, at the hearing, that he had never before hit an official or otherwise been involved in any analogous altercation. *See* Comm. Tr. at 58. He further testified that he did not see the lineman until "the very last second," and that he raised his stick as an instinctual reaction. *See id.* at 79. Asked whether, "[l]ooking at th[e] video now, putting aside what [he] actually did, ... [he] would agree . . . that [the strike in question was] the kind of conduct that could cause an injury," Wideman responded, "[r]ight." *Id.*

several days after the incident (and after his symptoms had resolved)," *id.* at 8, and that their testimony suffered from inconsistencies and other problems that dulled its weight, *id.* at 11. In particular, the Commissioner noted that the video footage contradicted the experts' testimony, *see id.* at 16, and noted that, upon his review of the footage, Wideman had "skated directly to the bench with his head up [after being checked by Salomaki] and gave no indication that he was confused (e.g., he did not hesitate, he did not skate in the wrong direction, or to the wrong bench or to the penalty box)," rendering the concussion narrative unconvincing, *id.* at 17.

### 5. The Arbitrator's Decision

The Players' Association appealed to the Neutral Discipline Arbitrator, James Oldham, under Article 18.13 of the CBA. From February 25-26, 2016, the Arbitrator conducted a two-day hearing to address Wideman's culpability. *See* Arb. Op. at 3.[4] At that hearing, both the NHL and the Players' Association (on behalf of Wideman) presented additional witnesses who had not testified before the Commissioner. First, the Players' Association presented the testimony of Matthieu Schneider, the Special Assistant to the Executive Director of the Players' Association, and a former professional hockey player, and Brad Treliving, the General Manager of the Flames (Wideman's hockey team). *See* Arb. Op. at 3; *see also* Arb. Tr. at 328, 356. As part of his testimony, Schneider provided a frame-by-frame interpretation of the video of the collision. *See, e.g., id.* at 365. He testified that, in his estimation as a professional hockey player, Wideman lost control of his body when he initially was hit by Salomaki, and that certain of Wideman's movements after the Salomaki check supported, in Schneider's view, such a conclusion. *See id.* at 331-33, 370. As to the moment that Wideman raised his hockey stick and hit Henderson,

---

[4] Excerpts from this longer hearing appear in two places in the record, Dkt. No. 20, Ex. 7, and Dkt. No. 24, Ex. 1. For ease of reference, the Court refers to the entire transcript as "Arb. Tr.," and cites to the relevant page number of the transcript (regardless of which exhibit that page number appears in).

Schneider testified that his review of the video suggested that it was best interpreted as a reflex action, rather than a deliberate strike. *Id.* at 335. Treliving, for his part, testified that Wideman had indicated shortly after the incident that the collision was accidental, a position with which Treliving agreed upon viewing the video himself. *See id.* at 409-10.

The NHL also offered two new witnesses: Stephen Walkom, the Senior Vice President and Director of Officiating for the NHL, and Dr. Ian Auld, the lead team physician for the Flames. Arb. Op. at 3. Walkom provided his interpretation of the video footage and the incident. *See* Arb. Tr. at 472. First, asked whether he had ever "seen anybody hit [an] official out of retaliation for being hit by a [fellow] player," Walkom responded that, apart from the instant incident, he had not. *See id.* at 492-93. Though Walkom generally testified that Wideman should have known that his strike against Henderson's back would cause injury, *see id.* at 460, he repeatedly stated that Wideman had likely made a mistake, before ultimately concluding "[m]y testimony is . . . that [Wideman] was upset, he's skating to the bench, and he made a mistake, and he cross-checked the linesman, and he knocked him to the ice with enough force to hurt him, even though he probably didn't intentionally mean to hurt him. That's my testimony." *Id.* at 493. Dr. Auld, for his part, testified as to his observations of Wideman after the incident. He averred that he did not examine Wideman until after the game because he did not believe he saw "any specific motoring incoordination [or] balance troubles" necessitating immediate examination. *Id.* at 531. Dr. Auld testified that, when he did examine Wideman after the game, Wideman indicated that he was "dazed" after the Solomaki check, but seemed to remember the hit with Henderson. *Id.* at 538-39.

Though Schneider, Treliving, Walkom, and Auld were the only new witnesses, Wideman and Henderson testified again before the Arbitrator, in lieu of simply relying on the transcripts of their prior testimony. *See* Arb. Op. at 3.

On March 10, 2016, the Arbitrator issued his decision: in a 17-page opinion, he determined that the Commissioner's "conclusion . . . that Wideman's behavior constituted intentional action within the meaning of Rule 40.2 . . . [was] not substantially supported by the totality of the evidence presented . . . at the [Neutral Discipline Arbitrator] hearing," and that "the proper penalty should have been that specified in League Rule 40.3 [i.e. a 10 games suspension]." Arb. Op. at 17; *see also* NHL Off. Rules § 40.3 ("Any player who deliberately applies physical force to an official in any manner (excluding actions as set out in Category I), which physical force is applied without intent to injure . . . shall be automatically suspended for not less than ten . . . games."). The Arbitrator thus reduced the suspension to ten games.

As part of his decision, the Arbitrator first analyzed the appropriate standard of review for his inquiry. *See* Arb. Op. at 11 (citing CBA Art. 18.13). The Arbitrator observed that the standard of review required by the CBA was, "[t]aken literally," subject to an internal inconsistency. *Id.* On the one hand, it directed the Arbitrator to determine whether the NHL's decisions "were supported by substantial evidence," *id.* (quoting CBA Art. 18.13), which suggested an assessment of whether evidence presented before the Commissioner provided substantial support for the Commissioner's determination. *See id.* On the other hand, the CBA authorized the Arbitrator to consider new evidence, not presented to the Commissioner—and indeed, the Arbitrator had considered extensive new evidence at his hearing without protest from either party. The CBA thus necessarily implied that, even if substantial evidence had existed at the Commissioner's hearing, the CBA must authorize "the [Arbitrator] [to] nevertheless disaffirm

what the Commissioner decided based on new evidence," or "the 'new evidence' language

[would be] meaningless." *Id.* at 12. Turning to the provision of Article 18.13 providing the

Arbitrator with "full remedial authority" after a determination that "the Commissioner's decision

was [past tense] not supported by substantial evidence," the Arbitrator again identified the same

contradiction. *Id.* (quoting CBA Art. 13) (alteration in original). "[T]aken literally," the

Arbitrator explained, "the logic of the language falters. If the Commissioner's decision *was not*

supported by substantial evidence, then it cannot be affirmed and the [Arbitrator] has full

remedial authority. But, what if the [Arbitrator] is persuaded by new evidence that the result

reached by the Commissioner was incorrect?" *Id.* Resolving these apparent tensions, the

Arbitrator articulated his standard of review as follows: "[T]his language must mean that the

[Arbitrator] has full remedial authority if the [Arbitrator] determines that the totality of the

evidence presented at the [Neutral Discipline Arbitrator] hearing does not provide substantial

support for the Commissioner's decision." *Id.*; *see also id.* at 13 (describing his task as

determining "whether, based on the record presented to [him], [the Arbitrator found] that the

Commissioner's decision upholding Wideman's twenty game suspension was supported by

substantial evidence").

Having articulated the standard of review, the Arbitrator proceeded to explain his decision as

follows. First, he described the video footage at length. He noted that the "parties agree that the

video of the collision is the best evidence . . . of exactly what happened." *Id.* at 9. The

Arbitrator then provided his own "close analysis of the video." *Id.* at 10. In that analysis, he

began by examining Wideman's position and awareness prior to the collision. He noted, *inter*

*alia*, that, as Wideman skated towards the bench following the Solamaki check, "[i]t [was]

possible, given the speed of events and Wideman's condition, that Henderson may have been but

a blurred distraction." *Id.* Next, the Arbitrator analyzed the collision itself, and in particular what exactly caused Henderson's injury (analysis potentially relevant to Wideman's intent and knowledge with regard to that injury). The Arbitrator described Henderson's footwork at the moment of impact, noting that the position of his left skate "may have made him more vulnerable to an unexpected push against his back then he might otherwise have been," *id.* at 10, a fact that suggested to the Arbitrator that Wideman's blow could have been less forceful and nevertheless produced injury, or that it might not have been as clear to Wideman that Henderson's injury would result. The Arbitrator further emphasized that Henderson hit his head on the boards as he fell—a potential source of the injury he experienced. *Id.* Turning to the positioning of Wideman's hands at the moment of collision, the Arbitrator stated that the precise positioning of his hands was such that would not "facilitate much pushing strength," and was not, as "[s]ome observers of the video" had suggested, "a cross-check" in the traditional sense. *Id.* at 10-11 (noting that it was "inaccurate" to refer to the blow as a "cross-check"). In light of the positioning of Wideman's hands and Henderson's skates, and the fact that Henderson hit his head on the boards as he fell, the Arbitrator concluded that it was "much more likely" that what caused Henderson to feel as if "he had been hit by a bus" was not the impact of Wideman's stick on his back, but the moment when Henderson's "head hit the boards on the way down." *Id.*; *see also id.* (referring to this impact as "the *only* hit that could have produced [Henderson's] concussion" (emphasis added)). The Arbitrator further stated that, because of the position of Wideman's head, he could not "have seen Henderson fall," and described the video as corroborating Wideman's own testimony that he was dazed. *See id.* (noting that, after reaching the bench, "Wideman ... sat on the bench, did not think to close the gate, held his head down for several seconds, then raised it and look around").

12

Second, the Arbitrator agreed with the Commissioner that the testimony of doctors Comper and Kutchner, who had testified only before the Commissioner, was not relevant to his determination. *See id.* at 9 n.9. That was because both parties agreed that Wideman had suffered a concussion, and neither Comper nor Kutchner "was on the scene of the incident" such that any additional insight could be offered as to how the concussion had affected Wideman. *Id.* The Arbitrator further concluded, as to the new testimony presented to him from Dr. Auld, that testimony was "necessarily inconclusive" and also not relevant to any determination. *Id.*

Finally, the Arbitrator analyzed the Commissioner's decision. *See id.* at 13. The Arbitrator agreed that Rule 40 provided an appropriate framework for determining the proper penalty. *Id.* at 13. He disagreed, however, that the evidence presented before him supported the conclusion that "Wideman's behavior was animated by an intent to injure Henderson, even taking into account [language in the rule defining 'intent to injure' to include 'any physical force which a player knew or should have known could reasonably be expected to cause injury']." *Id.* at 14 (quoting NHL Off. Rules § 40.2). The Arbitrator justified this conclusion with four pieces of analysis. First, he noted that "an important piece of new evidence, in the testimony of Stephen Walkom" (a witness for the NHL) supported the conclusion that Wideman's act was not intentional. *Id.* at 14. Second, though in footnote, the Arbitrator noted that "there was not even a scintilla of evidence to suggest why a player with Wideman's excellent disciplinary record would intentionally strike Linesman Henderson." *Id.* at 14 n.12. Though "motive [was] not always necessary to prove intent," the Arbitrator observed that "the complete absence of any imaginable motive can give pause in assessing whether Wideman made contact with Henderson with intent to harm him." *Id.* Third, the Arbitrator turned to the Commissioner's assessment of the video, which the Arbitrator stated rested on the Commissioner's conclusion that "Mr.

Wideman struck Henderson with the shaft of his stick and caused him injury." *Id.* at 14.  The

Arbitrator referenced his own interpretation of the video, in which he concluded that, though it

was "impossible to be *completely certain*," it appeared "that the first contact between Wideman

and Henderson was from Wideman's right hand while holding the stick at an upward angle," that

Wideman had then "pushed with his left hand, causing Henderson's fall," and that the injury had

been caused not by the collision, directly, but by Henderson losing his footing and hitting his

head on the Boards. *Id.* at 10-11 (emphasis added).  Fourth, the Arbitrator analyzed some of the

evidence on which the Commissioner had relied, including Wideman's supposed

acknowledgment in testimony before the Commissioner that "his blow to Mr. Henderson's back

was the kind of blow that can reasonably be expected to cause injury." *Id.* at 15 (quoting Comm.

Op. at 7).  The Arbitrator analyzed that testimony and concluded that, viewed in context, it said

nothing about Wideman's knowledge or intent at the time. *See* Arb. Op. at 15 (noting that the

testimony ended with "a hypothetical"); *see also supra* note 3.  Finally, assessing the secondary

meaning of intent to injure under Rule 40.2, including "any physical force which a player knew

or should have known could reasonably be expected to cause injury," the Arbitrator concluded

that this contract provision should be interpreted to take into consideration "what the [specific]

player should have known, taking into account the specific circumstances that occurred." *Id.* at

16.  With this construction of the rules as his backdrop, the Arbitrator concluded that, in light of

Wideman's "concussed state" and the Arbitrator's specific analysis of the video, "Wideman

could [not] . . . have anticipated that his push would cause Henderson to fall and bang his head

against the boards sufficiently hard to put Henderson also in a concussed state." *Id.* at 16.

Having found that the video did not support the Commissioner's conclusion, that new

evidence contradicted it, and that other evidence on which the Commisioner relied could not

support that conclusion, the Arbitrator determined that the Commissioner's "conclusion [was] not substantially supported by the totality of the evidence presented to [him] at the [Neutral Discipline Arbitrator] hearing." *Id.* at 17. The Arbitrator then proceeded to find that a 10-game penalty, which reflected the lower mens rea of Rule 40.3, was justified instead.

## II.   Procedural History of the Present Action

On June 8, 2016, the NHL filed a Complaint in the Southern District of New York, seeking vacatur of the Arbitrator's decision on the basis that he failed to adhere to the standard of review laid out in the CBA and thus exceeded his authority under that agreement. *See generally* Complaint. On July 29, 2016, the Players' Association filed a motion to dismiss or, in the alternative, to confirm the arbitration award. *See* Motion to Confirm. In that motion, the Players' Association argued, first, that "[a]ny court challenge to a labor arbitration award must be initiated by a motion to vacate, not a complaint," and, in the alternative, that the Arbitrator did not exceed his authority under the CBA. *See id.* at 16-23.

For the reasons that follow, the Court denies the Players' Association's motion to dismiss the Complaint on procedural grounds. Nevertheless, because the Court finds that the Arbitrator was at least "arguably construing or applying" the CBA in reaching his decision, the Court grants the Players' Association's motion to confirm. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (internal quotation marks omitted).

## III.   The Players' Association's Motion to Dismiss

The Court first addresses the Players' Association's motion to dismiss. The Players' Association argues that, under the Federal Arbitration Act ("FAA"), a party challenging an arbitration award must initiate that action by filing a motion to vacate, rather than a complaint,

and that, though the instant case arises not under the FAA but under the Labor Management

Relations Act ("LMRA"), 29 U.S.C. § 185, the same rule applies and the Court must grant the

motion to dismiss. *See* Motion to Confirm at 13 (citing *Kruse v. Sands Bros. & Co.,* 226 F.

Supp. 2d 484, 487 (S.D.N.Y. 2002) (finding that an action to vacate a commercial, rather than

labor, arbitration award was improperly initiated as a complaint, and therefore that the complaint

had to be dismissed)).

The Court disagrees. Even assuming, *arguendo*, that the NHL should have initiated this

action as a motion to vacate, rather than as a complaint, the parties have now fully briefed their

respective positions on the merits of this action, and there is no reason for the Court not to reach

those merits. As the NHL points out, courts have often addressed the merits of an action to

vacate an arbitration award notwithstanding objections by defendants that the action was

improperly filed as a complaint, under both the FAA and the LMRA. *See, e.g.*, *Orange &*

*Rockland Utils., Inc. v. Local 503, Intern. Bhd. of Elec. Workers*, No. 05 Civ. 6320 (WCC), 2006

WL 1073049, at *3 (S.D.N.Y. Apr. 21, 2006); *U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*, 188 F.

Supp. 2d 358, 362–63 (S.D.N.Y.), *aff'd,* 51 F. App'x 66 (2d Cir. 2002) (summary order). In

support of the contrary proposition, the Players' Association cites to a single district court case

where the court dismissed a complaint arising under the FAA for procedural impropriety. *See*

*Kruse*, 226 F. Supp. 2d at 486. The reasoning of that case is not persuasive. *Kruse* primarily

relied on *O.R. Securities, Inc.*, an Eleventh Circuit case that held that FAA (not LMRA) actions

may not be initiated via complaints. *See Kruse*, 226 F. Supp. 2d at 486 (citing *O.R. Sec., Inc. v.*

*Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 746 (11th Cir. 1988)). Nevertheless, though the

Eleventh Circuit agreed that the action to vacate should not have been filed as a complaint, it

went on to hold that "[t]he fact that [the] motion [to vacate] came before the district court on [the

defendant's] Motion to Dismiss Complaint [did] not affect [the court's] disposition of th[e] case." *O.R. Sec., Inc.*, 857 F.2d at 746. Because the "memoranda of both parties submitted to the district court adequately briefed the issue of whether the arbitration award in question should have been vacated," the Eleventh Circuit found the procedural error to be inconsequential. *Id.*

So it is here. Before the Court are the Players' Association's motion to confirm, and the NHL's motion for summary judgment seeking an order vacating the Arbitrator's award. Though both motions arrive in different procedural postures, neither party has indicated that the respective statuses of the NHL's motion as one for summary judgment and the Players' Association's as a motion to confirm in any way affect the standard of review or the nature of the Court's inquiry. Nor has either party suggested that any disputed questions of material fact should, or could, affect the Court's decision. Whether or not the NHL should have initiated this action as a complaint, the question of whether the award should be vacated or confirmed is now squarely before the Court.

## IV.    The NHL's Motion to Vacate, and the Players' Association's Motion to Confirm

Having concluded that it is appropriate to reach the merits, the Court now turns to the arbitration award itself. Because the Court finds that the Arbitrator was at least "arguably . . . acting within the scope of his authority" as defined by the collective bargaining agreement, the Court confirms the award. *Garvey*, 532 U.S. at 509.

### A. Legal Standard

A court's "review of an arbitration award under the LMRA is . . . 'very limited.'" *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 536 (2d Cir. 2016) (quoting *Garvey*, 532 U.S. at 509). Courts are "not authorized to review the

arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Id.* Instead, courts may "inquire only . . . whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement." *Id.* "As long as the award 'draws its essence from the collective bargaining agreement,'" it must be confirmed. *Id.* (quoting *Intern. Bhd. Of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 714 (2d Cir. 1998)).

In determining whether an arbitrator exceeded his authority under a collective bargaining agreement, a court shows substantial deference to the arbitrator's decision. Thus, as long as an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Garvey*, 532 U.S. at 509 (quoting *Eastern Ass. Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)); *see also id.* ("When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 39 (1987)); *Nat'l Football League Mgmt. Council*, 820 F.3d at 539 (finding that, as long as an arbitrator's interpretation of a contract was "at least 'barely colorable,'" the court was required to confirm the award (quoting *In re Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir.1978)). Further, this deference is required even with respect to the arbitrator's interpretation of his own authority under the contract. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 765 (1983). Finally, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." *United*

*Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960).  Unless it is "apparent that [the arbitrator] went beyond the [scope of his delegated authority]," ambiguity as to whether he did so is insufficient to justify vacatur.  *Id.*

## B. Discussion

Notwithstanding the standard of review applicable when this Court reviews an arbitration decision, the NHL argues that the Arbitrator in this case so manifestly exceeded his authority under the CBA that the award should be vacated.  To this end, the NHL argues, first, that the Arbitrator, interpreting the scope of his own authority under the CBA, found that his role was solely to determine whether substantial evidence existed to support the Commissioner's decision. Motion to Vacate at 13.  Though the NHL agrees with this determination, it argues that the Arbitrator subsequently made no effort to be faithful to this standard, devoting his opinion "almost entirely to [his] own fact-finding." *Id.* at 3-4.  The Players' Association, in response, argues first that the Arbitrator did not find that a pure substantial evidence standard applied, but reasonably adopted a less deferential standard of review.  Dkt. No. 22 at 5-9 (hereafter "Players' Ass'n Reply").  Relying in part on this more deferential standard, the Players' Association argues that a review of the opinion makes it at least arguable that the Arbitrator faithfully applied the standard as he found it. *See id.* at 9-13.

The Players' Association is correct: because it is at least "arguable" that the Arbitrator's decision applied the parties' bargained for agreement, the Court must confirm the award. *Garvey*, 532 U.S. at 509.

## 1.  The Arbitrator's Interpretation of the Standard of Review under the CBA

Although the NHL purports to challenge only the Arbitrator's application of the standard of review under the CBA, and not his articulation of it, it is evident that the parties disagree as to how the Arbitrator interpreted the standard of review in the CBA, and that this disagreement is relevant to the question of whether the Arbitrator exceeded his authority in applying that standard. The Court thus begins with an analysis of the Arbitrator's construction of the CBA's standard of review.

As noted, the Arbitrator began his opinion with an analysis of the appropriate standard of review. First, he explained that the CBA contained an internal contradiction: On the one hand, it required upholding the Commissioner's decision if that decision was "supported by substantial evidence." Arb. Op. at 11 (quoting CBA Art.18.13(c)). On the other hand, the CBA provided the Arbitrator the authority to hear new evidence. These provisions were inconsistent: even if the Arbitrator found that substantial evidence existed on the previous record to support the Commissioner's decision, the CBA allowed him to be "persuaded by new evidence that the result reached by the Commissioner was incorrect." *Id.* at 12. Attempting to reconcile these provisions, the Arbitrator articulated his standard of review: "The provisions must authorize the [Arbitrator] to decide whether the totality of the evidence presented at the [Neutral Discipline Arbitrator] hearing comprises substantial support for the Commissioner's decision." *Id.*

Interpreting this language, the NHL argues that the Arbitrator settled on a classic substantial evidence standard – a highly deferential standard that precludes a reviewer from engaging in fact-finding or credibility determinations. *See* Motion to Vacate at 13 (citing *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 533 (2d Cir. 2005) ("[Substantial evidence] is a deferential standard.")). Relying in part on this standard, the NHL argues that the Arbitrator's opinion ultimately failed to exhibit the very deference he himself acknowledged to

be required. *See id.* The Players' Association, interpreting the same language, argues that the

Arbitrator settled on a less deferential standard of review, one akin to those generally applicable

when a court is permitted to hear new evidence unavailable to the prior decisionmaker. *See*

Players' Ass'n Reply at 5-9 (citing *Kappos v. Hyatt*, 132 S. Ct. 1690, 1696-70 (2012 ) ("When

the district court [may consider new evidence], it must act as a factfinder. In that role, it makes

little sense for the district court to apply a deferential standard of review to [administrative]

factual findings that are contradicted by the new evidence.")); *Garcia v. Bd. Of Educ. of*

*Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (describing the standard governing

review of an agency disposition under the Individuals with Disabilities Education Act

[("IDEA")], 20 U.S.C. § 1415(i)(2)(C), where the district court must both receive an

administrative record *and* hear new evidence, as laying out a "modified *de novo* standard"

(internal quotation marks omitted)). The Players' Association argues that the Arbitrator's

subsequent opinion was faithful to the scope of his authority as he interpreted it under the CBA.

    Neither party's description of the Arbitrator's standard of review is entirely correct.

Though, as the NHL notes, the Arbitrator stated that his ultimate inquiry would turn on the

presence or absence of substantial evidence for the Commissioner's decision, he nevertheless, as

the Players' Association points out, affirmed that that inquiry would first have to take into

account the significance and meaning of new evidence not available to the Commissioner and its

effect on the entire record. The Arbitrator's articulation of the standard of review, then, can best

be described as a hybrid between the competing sets of standards cited by the parties: less

deferential than substantial evidence review, but not a de novo inquiry. It is against this standard

– an unquestionably arguable interpretation of the CBA – that the Court evaluates the rest of the

Arbitrator's decision. *See W.R. Grace & Co.*, 461 U.S. at 765 ("[T]he scope of the arbitrator's

authority is itself a question of contract interpretation that the parties have delegated to the arbitrator.").

## 2. The Arbitrator's Application of that Standard of Review

Turning to the substance of the Arbitrator's opinion, the Court finds that the Arbitrator, having reasonably interpreted the standard of review under the CBA, at least "arguably . . . act[ed] within the scope of his authority" in applying that standard to the record before him. *Garvey*, 532 U.S. at 509; *see also Nat'l Football League Mgmt. Council*, 820 F.3d at 539 (holding that, if an arbitrator's interpretation of a contract is "at least 'barely colorable,'" the award must be confirmed) (internal quotation marks omitted)).

First, extensive language in the opinion makes it at least arguable that the Arbitrator understood himself to be applying a largely deferential standard of review. Most obviously, the Arbitrator repeated the standard of review at the beginning and end of his analysis. *See* Arb. Op. at 13 ("I am to decide whether, based on the record presented to me, I find that the Commissioner's decision . . . . was supported by substantial evidence"); *accord id.* at 17. More subtly, language in the opinion frequently indicated that the Arbitrator understood his interpretation not simply to be the correct one, but to be the only reasonable one on the basis of the evidence before him. *See id.* at 14 (referring to his disagreement with the Commissioner's decision as a "fundamental disagreement"); *id.* at 10 (noting that, though "[i]t is impossible to be *completely* certain," a key aspect of the Arbitrator's interpretation of the video appeared the correct one (emphasis added)); *id.* at 11 (noting that "it seems *much more likely* that the hit that [Henderson] felt (and the *only* hit that could have produced his concussion) was when his head hit the boards on the way down" (emphases added)); *id.* at 14 n.12 (noting that "there was not even a scintilla of evidence to suggest why" Wideman would intentionally "strike Linesman

22

Henderson"). Such language does not suggest that the Arbitrator settled on what he viewed to be simply the more likely of two reasonable interpretations, but that he had a "fundamental disagreement" as to what the evidence could reasonably show. Arb. Op. at 14.

Second, analysis of the structure of the opinion again makes evident that it at least arguable that the Arbitrator applied a deferential, rather than de novo, standard of review. The Arbitrator began by analyzing the primary evidence on which the Commissioner relied – the video – and provided a detailed explanation of why he did not believe the video could support any inference of intent. *See id.* at 10-11. The Arbitrator then proceeded to explain, first, why new evidence in the record before him suggested that the Commissioner's decision was unreasonable, and second, why evidence in the record before the Commissioner (in particular, certain testimony by Wideman) could not be read to support the Commissioner's decision. *See id.* at 14-15. In so doing, the Arbitrator addressed many of the evidentiary bases for the Commissioner's decision, and also addressed the relevance of new evidence to the totality of the evidence before the Arbitrator. Whether or not his ultimate conclusion was the only reasonable one, then, the Arbitrator's analytical process does not make unambiguously clear that he failed to apply the proper standard of review.

In support of the contrary position, the NHL cites to specific language in the Arbitrator's decision that it claims makes evident that the Arbitrator failed to apply the standard of review under the CBA as he understood it. *See* Motion to Vacate at 23. The Court disagrees.

First, the NHL points to language in the opinion that it claims suggests the Arbitrator understood certain disputed questions to be difficult – i.e. the sorts of questions on which reasonable minds could disagree – but that he nevertheless supplanted the Commissioner's understanding of that evidence with the Arbitrator's own. *See, e.g.*, Motion to Vacate at 20; *see*

*also* Arb. Op. at 6 ("As has been evident throughout this proceeding, interpretations of exactly what happened [between Wideman and Henderson] can and do differ."); *id.* at 16 ("What, exactly, Wideman should have known [at the moment he collided into Henderson]. . . is not an easy question to answer."). Although the language the NHL cites could be read as the NHL reads it, alternative constructions of it are, at the very least, "arguable." *Garvey*, 523 U.S. at 509. The Arbitrator's statement that interpretations of the collision "can and do differ" could be interpreted to suggest that the video evidence, like the testimony of the various doctors, was necessarily inconclusive, and thus could not be relied upon, on its own, as support for the Commissioner's decision. Indeed, the Arbitrator described the Players' Association's argument as largely taking that position. *See* Arb. Op. at 7. On the other hand, the Arbitrator's language (both as to the video and as to the question of Wideman's knowledge of risk) may simply have been an acknowledgment that many individuals had testified before the Arbitrator as to their understanding of the video footage of the collision and as to what Wideman did or should have known, and that many individuals had distinct opinions as to the proper answers to those questions. Such an acknowledgment of good-faith disagreements among the parties would not constitute a concession that substantial evidence supported multiple constructions of Wideman's intent. In short, this language does not require the conclusion that the Arbitrator ignored the CBA's standard of review as he understood it.

Second, the NHL points to locations in the opinion where the Arbitrator references his own beliefs or opinions. *See, e.g.*, *id.* at 14 ("As is clear from my analysis of the video . . ., I do not share [the Commissioner's] interpretation of what the video shows."); *id.* at 14 ("[B]ased on the totality of the evidence presented to me, I do not think that Wideman's behavior was animated by an intent to injure Henderson . . . ."). According to the NHL, such statements make clear that

the Arbitrator, rather than seeking support for the Commissioner's decision, was simply seeking support for his own. Again, however, alternative explanations for this language are at least arguable. As an initial matter, one would expect the Arbitrator to disagree with the Commissioner's interpretation of much relevant evidence if the Arbitrator believed substantial evidence did not support the Commissioner's conclusion. The Arbitrator's opinions and beliefs as to what the evidence meant, though not necessarily sufficient conditions, would thus be necessary conditions to a finding that no substantial evidence supported the Commissioner's disposition. Second, the fact that the Arbitrator expressed his conclusions as opinions does not demonstrate the weight he gave those opinions: in other words, his language is not conclusive as to whether he believed the better read of the evidence was his, or whether, instead, he came to believe that the only reasonable read of the evidence was his. *Cf.* Arb. Op. at 17 ("[I]n my opinion, [the Commissioner's] conclusion [was] not substantially supported by the totality of the evidence . . . ."). Finally, even were this Court to agree that such language *might* be out of place in a traditional judicial review of an agency's decision pursuant to a substantial evidence standard, in suggesting that the language constitutes a smoking gun here, the NHL ignores the fact that the Arbitrator had to balance analysis of new evidence with an ultimately deferential framework. *See, e.g.*, Arb. Op. at 14 ("My opinion on the question of intent is supported by an important piece of new evidence, in the testimony of Stephen Walkom . . . ."). Rhetorical precision could not be expected in the context of a hybrid standard of review with no obvious antecedents and no clear application.

Finally, the Court notes that the NHL does not argue that no reasonable arbitrator could possibly, on the basis of the record at the Neutral Discipline Arbitrator hearing, have reached the Arbitrator's decision. *See* Motion to Vacate at 23 (noting that "[t]he point here is not to re-

25

litigate the underlying facts leading to Wideman's suspension or to ask the Court to second-guess factual findings the way the [Arbitrator] did. . . . The [NHL's] discussion [of the evidence at the [Neutral Discipline Arbitrator hearing] illustrates[, instead,] how the appropriate mode of analysis should have proceeded . . . ."); NHL Reply at 2 ("The arbitration award must be vacated because the [Arbitrator] exceeded his authority, not simply because he reached an erroneous result."). Nevertheless, even were the NHL to have made such an argument, it would not justify vacatur here. In reviewing an arbitral decision, courts are "not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors." *Nat'l Football League Mgmt. Council*, 820 F.3d at 536; *see also Garvey*, 532 U.S. at 509 (holding that an "arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award" (quoting *United Paperworkers Int'l Union,* 484 U.S. at 39)). Whether or not the Arbitrator's ultimate conclusion was the most appropriate one, then, it is at least the case that the evidence presented to him – including both new evidence and evidence already presented to the Commissioner – was not so one-sided as to preclude any Arbitrator acting within the scope of his authority from reaching the same conclusion.

In assessing the Arbitrator's decision in this case, the Court is mindful of its "very limited" role. *Nat'l Football League Mgmt. Council*, 820 F.3d at 536 (internal quotation marks omitted). Whether or not this Court might reach the same decision as the Arbitrator were it presented with the same record is not relevant. Because it is at least arguable that the arbitrator applied the standard of review bargained for in the CBA, the award must be confirmed. *See Nat'l Football League Mgmt. Council*, 820 F.3d at 536 ("If the arbitrator acts within the scope of his authority, the remedy for a dissatisfied party 'is not judicial intervention,' but 'for the parties to draft their

agreement to reflect the scope of power they would like their arbitrator to exercise.'" (quoting

*United Bhd. of Carpenters v. Tappan Zee Constr., LLC,* 804 F.3d 270, 275 (2d Cir. 2015)).

## V.    Conclusion

In conclusion, the Court denies the Players' Association's motion to dismiss, grants the

Players' Association's motion to confirm, and denies the NHL's motion for summary judgment.

This resolves docket numbers 13 and 18.

SO ORDERED.

Dated: March **15**, 2017
        New York, New York

_____
ALISON J. NATHAN
United States District Judge

27